DAVID S. HEAD, No. 13237
HEAD LAW, PLLC
5411 S. Vine St., # 4A
Murray, UT 84107
Telephone: (801) 691-7511
Facsimile: (801) 691-7512
dhead@headlawusa.com

RAPHAEL JANOVE, No. 19283
JANOVE PLLC
500 7th Ave., 8th Floor
New York, NY 10018
Telephone: (646) 347-3940
raphael@janove.law

*Attorneys for Plaintiffs and
similarly situated persons*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| LISA HUMPHREYS, in her individual capacity and on behalf of others similarly situated, and JARON HUMPHREYS, in his individual capacity and on behalf of other similarly situated, | **COMPLAINT** <br><br> **(Proposed Class Action)** <br><br> **(Jury Demand)** |
| Plaintiffs, | |
| v. | Civil No. _____2:26-cv-53_____ |
| FCA US, LLC, a Delaware limited liability company, and DOUG SMITH AUTOPLEX, INC., a Utah corporation, | Judge: _____ |
| Defendants. | |

COME NOW Plaintiffs, by and through counsel, hereby allege and complain of the following on behalf of themselves and other similarly situated persons:

## PARTIES & JURISDICTION

1.    Plaintiffs, Lisa and Jaron Humphreys ("Humphreys"), are residents of Cache County, Utah.

2.    Defendant, FCA US LLC ("FCA"), is a Delaware limited liability company and headquartered in Michigan. FCA is wholly owned by Stellantis N.V. which is headquartered and registered in Amsterdam, The Netherlands. FCA is doing business in the State of Utah.

3.    Defendant FCA, through various entities, markets, distributes, warrants and sells vehicles and parts for those vehicles, including the Class Vehicles, in every state throughout the United States, including Utah.

4.    Defendant, Doug Smith Autoplex, INC. (Doug Smith), is a Utah domestic corporation registered and headquartered in American Fork, Utah.

5.     This Court has subject matter jurisdiction over this action, which is brought as a statewide class action, under the Class Action Fairness Act. *See* 28 U.S.C. § 1332 (d). The aggregated claims of the individual Class Members exceed $5,000,000, exclusive of interests and costs, there are at least 100 putative class members, and this is a class action in which more than two-thirds of the putative class and Defendants are

citizens of different states. Accordingly, Plaintiffs' class action in this District is proper under the Class Action Fairness Act.

6.      Venue is proper in this District pursuant to 28 U.S.C. § 1391, because the actions giving rise to the lawsuit took place in this District.

## GENERAL ALLEGATIONS

**A.      Introduction**

7.      This is class action lawsuit brought by Plaintiffs, individually and on behalf of all others similarly situated who purchased or leased a 2020-2025 Jeep Wrangler 4XE or a 2022-2026 Jeep Grand Cherokee 4XE (collectively, the "Class Vehicles").

8.      The Class Vehicles are "plug-in hybrid" electric vehicles (PHEVs) equipped with a high voltage lithium-ion battery pack ("HV Battery") manufactured by Samsung SDI.

9.      However, the Class Vehicles suffer from a latent safety defect: the HV Battery is prone to internal failure leading to thermal runaway and spontaneous vehicle fires (the "defect").

10.     FCA has suggested in multiple filings with the NHTSA that the defect in the vehicle batteries is caused by "separatory damage." *See* Exhibit A. (https://static.nhtsa.gov/odi/rcl/2024/RCLRPT-24V720-8602.PDF).

11.     The defect can cause Class Vehicles to spontaneously catch fire even when the ignition is off and the vehicle is parked.

12.    FCA has issued multiple recalls regarding this defect. In these recall notices, FCA has admitted the remedy is currently under development or ineffective, and has instructed owners not to recharge their vehicles, and to park outside and away from structures. *See* Exhibit B.

13.    As a result, Plaintiffs and Class Members are left with vehicles they cannot safely charge, cannot park in their garages, and cannot use as the hybrid-electric vehicles they paid a premium to own.

**B.    Facts Regarding Plaintiffs**

14.    On December 1, 2022, Plaintiffs and proposed class representatives Humphreys, like other putative class members, purchased a 2023 Jeep Wrangler Unlimited (2.0 L) Sahara 4X4, or other types of Class Vehicles that are PHEVs, have a HV Battery, and were either purchased from Defendant Doug Smith or other suppliers.

15.    Defendant Doug Smith is a certified and/or authorized Jeep dealer.

16.    Plaintiffs Humphreys purchased the vehicle for $68,703.58 after taxes and fees.

17.    Plaintiffs Humphreys purchased the vehicle after viewing advertisements discussing Jeep Wrangler's reliability and safety.

18.    Based on FCA's and Doug Smith's advertising, Plaintiffs believed Jeep Wranglers and Cherokees were safe and reliable vehicles without latent defects that impact the safety of their vehicles.

19.    Around November 2025, FCA sent a recall notice to Plaintiffs notifying them of the defect with the HV Battery in their vehicle, that they should not charge the battery or be near other vehicle or structures. FCA said that a remedy was not currently available for the defect.

20.    Plaintiffs Humphreys and other similarly situated plaintiffs would not have purchased or leased the 2020-2025 Jeep Wrangler 4XE or 2022-2026 Jeep Grand Cherokee if Plaintiffs were made aware of the latent defect that could cause spontaneous underhood fires.

21.    The latent defect has caused or will cause underhood fires to the property of Plaintiff and class member and other damages, including expensive repairs, car rentals, towing charges, time off work, loss of use of their vehicle, and/or other miscellaneous costs. The defect has also prevented Plaintiffs and class members from being able to sell their vehicles as they are not merchantable.

22.    The latent defect has also caused an ascertainable loss in the value of the subject class vehicles.

### C. Facts Regarding FCA

#### i. Prior Recalls

##### a) Recall NHTSA ID 23V-787

23.    On May 12, 2023, FCA's Technical Safety and Regulatory Compliance organization opened an investigation after receiving reports of Class Vehicles

spontaneously catching fires "originating from the HV battery." *See* Exhibit C

(https://static.nhtsa.gov/odi/rcl/2023/RCLRPT-23V787-2073.PDF).

24.    After investigating the defect, FCA issued a recall in November of 2023 for

2021-2023 Jeep Wrangler hybrid vehicles for the HV Battery manufactured by Samsung

SDI and present in all Class Vehicles. *See id*.

25.    As part of the recall, FCA advised owners to not recharge their vehicle or

park next to structures until the recall repair has been completed. *See id*.

26.    FCA's ineffective remedy for this recall was updating the software and

replace HV Battery packs if needed. *See id*.

### b) Recall NHTSA ID 24V-720

27.    On September 27, 2024, FCA issued an additional and expanded recall for

2020-2024 Jeep Wrangler 4XEs and 2022-2024 Jeep Grand Cherokees.

28.    On June 25, 2024, FCA opened another investigation after receiving reports

regarding fires originating from the HV Battery packs that were outside the scope of the

previous recall. *See* Exhibit A (https://static.nhtsa.gov/odi/rcl/2024/RCLRPT-24V720-

8602.PDF).

29.    FCA reportedly conducted an analysis of the HV Battery packs from April

2024 through July 2024 to determine the cause of the defect. *See id*.

30.    FCA also received reports during their investigation of fires originating in

HV Battery packs that received the previous recalls software update remedy. *See id*.

31.    FCA admitted that the previous recall remedy's software update was an ineffective remedy that failed to resolve the defect in the Class Vehicles. *See id.*

32.    FCA released a purported remedy for all 2020-2024 Jeep Wrangler 4XEs and Jeep Grand Cherokee 4XEs by December of 2024. *See* Exhibit D.

https://static.nhtsa.gov/odi/rcl/2024/RCRIT-24V720-2528.pdf

33.    FCA's purported remedy included another software update and replacement of HV Batteries that meet certain criteria. *See id.*

### D. Recalls Involving Samsung SDI HV Batteries

34.     Samsung SDI HV Batteries were involved in similar recalls for similar issues.

35.    For example, on August 11, 2020, Ford issued a recall for Kuga Plug-in hybrid vehicles that contained similar HV Batteries manufactured by Samsung SDI. *See* Exhibit E (https://insideevs.com/news/449322/samsung-sdi-root-ford-bmw-phev-recalls/).

36.    Similarly, on October 13, 2020, BMW issued a recall for plug-in hybrids assembled with similar HV Batteries manufactured by Samsung SDI. BMW's recall stated that "the batter production process allowed impurities to enter the cells" causing the thermal runaway defect. *See id.*

37.     In March 2022, Samsung recalled more than 1,100 of its HV Batteries

present in Ford and FCA vehicles for poor manufacturing quality. *See* Exhibit F

(https://static.nhtsa.gov/odi/rcl/2022/RCLRPT-22E005-3386.PDF).

38.     On February 11, 2022, FCA issued a recall on 2017-2018 Chrysler Pacifica

plug-in hybrids, and an update submitted on September 22, 2022, identified the HV

Battery as the source of the defect. *See* Exhibit G

(https://static.nhtsa.gov/odi/rcl/2022/RCLRPT-22V077-6946.PDF).

39.     FCA recall of 2017-2018 Chrysler Pacifica vehicles originated in August of

2021 when FCA began investigating reports of fires occurring in the subject vehicles. *See*

*id*.

40.     On January 16, 2024, the Office of Defects Investigation announced an

opening of an investigation into FCA "to review the effectiveness of the original recall

remedy, understand the root cause of the battery fires, investigate additional reports of

Pacifica PHEV HV battery fires, and to increase monitoring of the manufacturer root

cause investigation." *See* Exhibit H (https://static.nhtsa.gov/odi/inv/2024/INOA-

RQ24001-10139.pdf).

41.     Notably, the Office of Defect Investigation initiated the investigation after

the software remedy from FCA's 2022 Chrysler Pacifica recall led to higher rates of

thermal events compared to before the purported recall remedy. *Id*.

42.     Accordingly, FCA had sufficient notice of the defect present in the Class Vehicles, and FCA had notice of the ineffectiveness of software remedies to fix the defect present in the HV Batteries.

**C. Current Recall**

43.     FCA issued its most recent recall on October 30, 2025 (NHTSA Recall ID 25V-741) for 2020-2025 Jeep Wrangler 4XEs and 2022-2026 Jeep Grand Cherokee 4XEs. *See* Exhibit I (https://www.nhtsa.gov/?nhtsaId=25V741000).

44.     Notably, FCA's most recent recall includes every Jeep Wrangler 4XE and Jeep Grand Cherokee ever manufactured, except the 2026 Jeep Wrangler 4XE.

45.     FCA still claims to be unaware of the root cause of the HV Battery defect other than vague statements regarding separator damage. *See id*.

46.     FCA again admitted that the previous remedy offered in the 2024 recall was ineffective and failed to fix the defect present in the HV Batteries of the Class Vehicles. *Id*.

47.     For some Class Vehicles, FCA has offered two remedies for the defect since 2023, and both remedies have failed to repair the defect present in the Class Vehicles.

48.     In December of 2025, FCA announced a remedy for the most recent recall for 2020-2025 Jeep Wrangler 4XEs. The remedy is a "software flash followed by a HV battery replacement, if needed." *See* Exhibit K.

49.    All remedies to date claim to help the onboard computer identify the existence of a HV Battery defect. But the software updates do nothing to remedy the defect present in the physical hardware, including the reported separator issue.

**D. General Factual Allegations Regarding FCA**

50.    FCA has not redesigned the HV Batteries in any model of Jeep Wrangler 4XE or Jeep Cherokee 4XE, despite reports of fires and defects as early as March 2021. *See* Exhibit J (https://www.nhtsa.gov/?nhtsaId=11403621).

51.    FCA is required to monitor complaints submitted to NHTSA pursuant to the TREAD ACT. *See* TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000). Accordingly, Defendants knew or should have known about the defect as early as March 2021. *See* id.

52.    In addition to the data from NHTSA consumer complaints, the TREAD Act requires that FCA track warranty data, including vehicle diagnosis and repairs from dealerships in a single, aggregated database.

53.    FCA almost certainly employs staff who review this database for trends in the data, and FCA had advanced warning of the defect through analysis of the repair data in this database.

54.    Despite all of this data, FCA has failed to adequately provide a solution to fixing the defect in Class Vehicles. And FCA continues to falsely claim that a software solution exists for structural defects in the Class Vehicle HV Battery.

### E. FCA Concealed and Made Misleading Partial Disclosures

55.    FCA has intentionally waited until the fall of each year to announce recalls regarding the HV Battery Defects to align with their manufacturing cycles which generally involves ending manufacturing of the Jeep model around August to November of each year. *See* Exhibit A, and Exhibit C.

56.    FCA has announced every recall for Jeep Wrangler 4XE and Jeep Cherokee in the fall of each year, and the announcement intentionally corresponds with the end of the manufacturing cycle to minimize the damages incurred by FCA.

57.    FCA continued to sell additional Class Vehicles after the initial recall in November 2023, and FCA was aware of the defects from their investigations in May 2023. *See* Exhibit C.

58.    FCA did not substantially change the design of their vehicles, substantially change the HV Battery present in the vehicle, or make any changes that would cause the defect to not be present in all Class Vehicles.

59.    For example, FCA listed the same part numbers in the November 2023 recall as a safety report published on December 18, 2025, for the most recent recall. This suggests that the same defective HV Battery was used in all Class Vehicles, and the design was also substantially similar if identical parts were used for all Class Vehicles. *See* Exhibit K, Exhibit A, and Exhibit C.

60.     Despite the limited changes, FCA intentionally limited its recall notices to slowly add newer models to limit the harm done to its business, and FCA had a duty to warn consumers of the almost certain likelihood of the defect being present in all models after the initial recall in November 2023. In the alternative, FCA limited its recall notices recklessly or negligently.

61.     In addition to its failure to disclose the defect, after the November 2023 recall, FCA continued manufacturing the 2024 Class Vehicles and 2025 Class Vehicles in a substantially similar way, despite forewarning of the defect present in the vehicles.

62.     FCA manufactured the 2024 Class Vehicles from the Fall of 2023 until the Fall of 2024, and the 2025 Class Vehicles were manufactured from the Fall of 2024 until the Fall of 2025. *See* Exhibit K.

63.     During FCA's November of 2023 recall, FCA made a business decision to not recall the 2024 models due to the manufacturing cycle beginning around that time period, and FCA did not want to face the devastating financial consequences of recalling a vehicle just as manufacturing of the vehicle begins for the next 12 months. In other words, FCA did not recall 2024 models to save money even though it knew the 2024 models were not safe to use. Therefore, FCA knowingly and intentionally put its own profits over the safety of its customers, including Plaintiffs and class members. In the alternative, it did so recklessly or negligently.

64.     During FCA's September 2024 recall, FCA made another business decision to not recall the 2025 Class Vehicles Models due to the manufacturing cycle just beginning for the year. It refrained from not issuing a recall despite the almost certain likelihood of the defect being present in the Class Vehicles because of the presence of the same HV Battery and little to no variation in the design of the vehicle. Again, FCA put its own profits over the safety of its customers, including Plaintiffs and class members. In the alternative, it did so recklessly or negligently.

65.     FCA intentionally or recklessly omitted material facts related to the standard, quality or grade of the Class Vehicles. FCA failed to disclose that the HV Batteries in the Class Vehicles contained a defect that substantially increased the risk of underhood fires, property damage, injury, death, and would substantially lower the value of the vehicles upon the almost certain likelihood of a future recall being announced.

66.     In the alternative, FCA negligently omitted material facts related to the standard, quality or grade of the Class Vehicles. FCA failed to disclose that the HV Batteries in the Class Vehicles contained a defect that substantially increased the risk of underhood fires, property damage, injury, death, and would substantially lower the value of the vehicles upon the almost certain likelihood of a future recall being announced.

67.     FCA owed a duty to disclose the defect present in the Class Vehicles and corresponding risks to Plaintiffs and the putative class members because FCA made statements that were not puffery, material statements about the Class Vehicles, possessed

superior and exclusive knowledge and data regarding the defect and the risks associated with the defect.

### F. Factual Allegations Regarding the HV Battery Present in Class Vehicles

68.    FCA, in their October 30, 2025, recall announcement stated that the "root cause" of the defect is still unknown, and FCA and Samsung SDI are continuing to investigate potential factors that could be causing the defect. *See* Exhibit L.

69.    As mentioned above, FCA has made vague statements about "separator damage" without any elaboration of the meaning of that statement. *See id*.

70.    FCA's vague statements and inability to find the root cause of the defect have left owners without explanation or reason to trust FCA's ability to remedy the defect, and these factors have led to further decreases in the value of the Class Vehicles, causing harm to Plaintiffs and putative class members.

71.    The HV Battery present in Class Vehicles suffer from a phenomenon known as "thermal runaway" which is a known risk associated with lithium-ion batteries.

72.    The HV Battery is a prismatic cell lithium-ion battery with 400-volt throughput, 17kwh capacity, and 96-cells. *See* Exhibit M (https://media.stellantisnorthamerica.com/newsrelease.do?id=22673&mid=1#:~:text=400%2Dvolt%2C%2017%20kWh%2C,efficient%2C%20environmentally%20friendly%2C%20%20electrification%20technology).

73.    The HV Battery contains different components for proper function, including cathodes, anodes, and separators.

74.    During use, the lithium ions move from the negative electrode (anodes) to the positive electrode (cathodes).

75.    During charging, the lithium ions move from the positive electrode (cathodes) to the negative electrode (anodes).

76.    The alleged defect—separators—are a porous membrane that prevents the anodes and cathodes from touching while allowing the lithium ions to pass through.

77.    If the anodes and cathodes touch, a short circuit occurs in the battery, and separators are essential in preventing short circuits from occurring.

78.    Moreover, separators contribute to the battery cell's thermal stability and safety.

79.    The separator should be stable and functional enough to operate at normal range of temperatures and functional enough to shut down once temperatures begin to rise to an unsafe level.

80.    However, the separators used in the Class Vehicles are not stable or functional enough to operate in the expected manner.

81.    Accordingly, the separator defect allows for thermal runaway to occur which is caused by unintended chemical reactions that occur at higher temperatures and

cause additional heating which can cause additional unintended chemical reactions and so on until a fire occurs.

82.    In addition, the thermal runaway event can occur multiple times prior to a fire occurring, and these events can cause dendrites to form which can further degrade the battery which increases the chance of later thermal runaway events to result in a fire.

83.    According to the December 18, 2025, Safety Recall Report, the Jeep Grand Cherokee Class Vehicles all contain Part Number 68540591AA, and this part is a 17.3kwh lithium-ion battery comprised of 96 prismatic cells, located under the vehicle frame and manufactured by Samsung SDI. *See* Exhibit K and Exhibit N. (https://media.stellantisnorthamerica.com/newsrelease.do?id=26268&mid=1519).

84.    According to the December 18, 2025, Safety Recall Report, the Jeep Wrangler Class Vehicles all contain Part Number 68488244AA, and this part is a 17.3 kwh lithium-ion battery comprised of 96 prismatic cells, located under the vehicle frame and manufactured by Samsung SDI. *See* Exhibit K and Exhibit M.

85.    While the manufacturing of the battery depended on Samsung SDI, the development and implementation of safety control systems intended to prevent thermal runaway remained under the control of FCA, and FCA's safety control mechanisms failed thereby causing degradation, dendrite formation, and thermal runaway in the Class Vehicles.

86.     Moreover, the NHTSA released a report on the risks and possible dangers posed by lithium-ion batteries in 2017.

87.     In the report, the NHTSA explicitly stated that "Individual manufacturers are expected to conduct their own due diligence safety testing and analysis, while the industry is working to develop a consensus." *See* Exhibit Q.

### G. FCA Marketing

88.     In FCA Marketing, FCA frequently made non-puffery statements regarding the Class Vehicles safety, reliability, etc., despite the falsity of the statements when considering the defect present in the Class Vehicles. In the alternative, it made such statements recklessly or negligently.

89.     For example, FCA, in a 2021 press release for the 2021 Jeep Wrangler 4XE, claimed that "the pack is fitted with a dedicated heating and cooling circuit to keep the battery at its optimum temperature for best performance." *See* Exhibit M.

90.     In FCA's advertising brochure for the 2022 Jeep Grand Cherokee, FCA stated that "Modern plug-in hybrid technology drives the Jeep Brand into a new, smart lane of travel. Ride earth-friendly, backed by exceptional, dependable engineering and design." *See* Exhibit O (https://cdn.dealereprocess.org/cdn/brochures/jeep/2022-grandcherokee.pdf).

91.     In addition, FCA's advertising discusses the benefits of the 4XE models by stating they have increased MPGs through its hybrid engine that increases the efficiency of the Class Vehicles. The reported eMPG is 49 when using all electric mode.

92.     However, the increased efficiency only occurs if consumers are able to safely charge the HV Battery, and consumers actually experience lower MPGs when unable to charge the battery. The 2023 Jeep Wrangler 4XE has 20 MPG in hybrid mode, and the Grand Cherokee has 23 MPG in hybrid mode.

93.     Ironically, some models of the 2023 Jeep Wrangler have a 23-25 combined MPG rating which provides a higher efficiency rating than the 4XE if unable to use the all-electric mode.

94.     However, the advertising for the 4XE frequently discussed the environmental and economic benefits associated with the advanced efficiency provided by the use of the HV Battery in conjunction with the gas engine, but Plaintiffs and putative class members have not seen those benefits due to FCA's inability to repair the defect present in Class Vehicles. *See, e.g.*, Exhibit P (stating "The incredibly capable Jeep Grand Cherokee 4XE is engineered to be planet-friendly";

https://web.archive.org/web/20220810014330/https://www.jeep.com/grand-cherokee/grand-cherokee-4xe.html).





**GOODBYE TO THE GAS LIGHT**

Daily commuters and neighborhood drivers may never have to gas up again. With an all-electric range of 25 miles and professionally-installed home chargers available, the Jeep Grand Cherokee 4xe has the lowest estimated annual fuel cost of any Grand Cherokee ever. Give back to your world—and your wallet.

95.    Plaintiff Jaron Humphreys spoke to the dealership salesman, Devan Nelson, regarding the prospective purchase of the Class Vehicle.

96.    Devan Nelson, as an employee and agent of Defendant Doug Smith Autoplex, Inc., made representations to Plaintiff Jaron Humphrey to induce him into purchasing the Class Vehicle.

97.    Devan Nelson represented to Plaintiff Jaron Humphrey that the Class Vehicle retains its value, and the Class Vehicle is a safe, reliable vehicle to purchase.

98.    On December 1, 2022, Devan Nelson made these statements and other representations to Plaintiff Jaron Humphrey.

99.    At the time of the sale, Devan Nelson was aware or should have been aware that the Class Vehicle does not retain its value and is not a safe, reliable vehicle.

**FRAUDULENT CONCEALMENT**

100.    Defendants knew of the existence of the defect in the Class Vehicles and continued to sell, distribute, and/or lease the Class Vehicles. Defendants concealed and expressly denied the existence of the defect in Class Vehicles and failed to notify Plaintiffs, Class, and Subclass Members of the defect.

101.    Defendants falsely represented that its vehicles were safe and reliable.

102.    Defendants had a continuous duty to disclose to Plaintiffs, Class and Subclass Members of the defect, and the true character and quality of the Class Vehicles prior to their purchase and/or after purchasing the vehicles.

103.    Although Defendants had a duty, Defendants chose to intentionally misrepresent and conceal the existence of the subject defects.

104.    Plaintiffs, Class and Subclass Members were unaware of the omitted and concealed material facts and reasonably relied on these facts, and Plaintiffs, Class and Subclass Members suffered damages as a result.

## CLASS ACTION ALLEGATIONS

105.    Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23(b)(3), on behalf of themselves and all others similarly situated, as members of the proposed statewide class:

   a.   **Utah Statewide Class**: All persons or entities who purchased or leased one or more model year 2020-2025 Jeep Wrangler 4XE and/or 2022-2026 Jeep Grand Cherokee 4XE plug-in hybrid electric vehicles.

b. **Utah Statewide Subclass**: All persons or entities who purchased or leased one or more model year 2020-2025 Jeep Wrangler 4XE and/or 2022-2026 Jeep Grand Cherokee 4XE plug-in hybrid electric vehicles from Doug Smith Autoplex, Inc.

106.    Excluded from the definitions of each Class and Subclass are claims related to personal injury or property damages.

107.    Excluded from the membership in any proposed class are Defendant and its subsidiaries and affiliates; all persons who make a timely election to be excluded from this action; governmental entities; the Judge to whom this case is assigned and their immediate family; and Plaintiffs' Counsel. Plaintiffs reserve the right to revise the Class definitions based upon additional information.

108.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

109.    **Numerosity**. According to the most recent recall, the number of Class Vehicles sold totals 320,068 as of October 30, 2025. The members of the statewide class are so numerous that individual joinder of all Class members is impracticable.

110.   **Commonality and Predominance**. This action involves common questions of law and fact, which predominate over any questions unique to any particular class member or class members, including, without limitation:

a)  Whether Defendants engaged in the conduct alleged herein;

b)  When Defendant should have first known about the defect;

c)  Whether the defect creates an unreasonable risk of fires in the Class Vehicles;

d)  Whether FCA designed, manufactured, marketed, and distributed the Class Vehicles with defective HV Batteries;

e)  Whether FCA's recalls were reasonable remedies to fix the defect present in Class Vehicles;

f)  Whether FCA's conduct renders it liable for breach of warranties;

g)  Whether FCA has been unjustly enriched at the expense of Plaintiffs and the Class and Subclasses;

h)  Whether Plaintiff and the Class and Subclass are entitled to damages and other monetary relief and, if so, in what amount; and

i)  Whether Plaintiffs and the Class and Subclass overpaid for their vehicles at the point of sale.

111.   **Typicality**. Plaintiffs' claims are typical of the Class and Subclass members' claims because all Class and Subclass Members were comparably injured through the wrongful conduct of the Defendants.

112.     **Adequacy**. Plaintiffs are adequate representatives because their interests do not conflict with the interests of the other class members they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs will prosecute their claims in this action vigorously on behalf of themselves and all others they seek to represent.

113.     **Superiority**. A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are expected to arise in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class and Subclass Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against FCA, so it would be impracticable to seek individual redress. Moreover, individualized litigation creates the potential for inconsistent or contradictory judgments and increases delays and expenses for all parties and the court system. A class action would allow for single adjudication and efficiency in the court system.

## FIRST CAUSE OF ACTION –Violation of the Magnuson-Moss Warranty Act (15 U.S.C. § 2301, et seq.)

*(Alleged by all Plaintiffs on behalf of themselves and the Statewide Class and Subclass against Defendant FCA)*

114.     Plaintiffs incorporate and re-allege all preceding paragraphs as if fully set forth herein.

115. This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332(a)-(d).

116. The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). Plaintiffs and Utah Statewide Class Members are consumers because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its implied warranties and express warranties.

117. FCA is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

118. 15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with an implied warranty or written express warranty.

119. Defendant FCA owed Plaintiffs, Class Members, and Subclass Members an implied warranty of merchantability in connection with the purchase or lease of their vehicles. This is an "implied warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7). As a part of the implied warranty, Defendant warranted that the Class Vehicles were fit for their ordinary purpose as safe passenger motor vehicles, would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

120.    Defendant breached its implied warranties, as alleged herein and in more detail above, and is therefore liable to Plaintiffs pursuant to 15 U.S.C. § 2301(d)(1). The Class Vehicles share a common design defect and/or manufacturing workmanship and materials defect in that they are designed and equipped with defective HV Batteries that are susceptible to separator damage, thermal runaway, and underhood fires. This defect caused all Class Vehicles to be unmerchantable and unfit for their ordinary use at the time of purchase/leasing and at all times thereafter.

121.    The Class Vehicles were sold with a "written warranty" and/or a "service contract" as those terms are defined in 15 U.S.C. § 2301(6) and 2301(8), respectively.

122.    Plaintiffs' purchase of the Class Vehicles was accompanied by express warranties as defined in 15 U.S.C. § 2301(6). Specifically, FCA provided all purchasers and lessees of the Class Vehicles with an express written warranty that covered the Class Vehicles, including but not limited to the battery, and FCA warranted the Vehicles to be free of defects in materials and workmanship at the time of purchase or lease. FCA also warranted that the Class Vehicles' high voltage battery pack was free of defects in design, materials, and workmanship and that repairs and other adjustments would be made by authorized dealers, without charge, to correct defects in materials or workmanship.

123.    FCA has breached its express warranties by failing to adequately repair the Class Vehicles. FCA sold the Class Vehicle with the defective HV Battery, requiring

repair or replacement within the applicable warranty periods, and refused to honor the warranties by providing free repairs or replacements during the applicable warranty periods sufficient for the Class Vehicle to be restored to its advertised qualities within a reasonable time.

124.    As alleged above, Defendant knew or should have known of the defect.

125.    Any efforts to limit the implied warranties in a manner that would exclude coverage of the Class Vehicles is unconscionable, and any such effort to disclaim, or otherwise limit liability for the Class Vehicles is null and void.

126.    Any efforts to impose limits on warranties are procedurally unconscionable due to unequal bargaining power between Defendant FCA and Plaintiffs and Class and Subclass Members. Plaintiff and Class and Subclass Members had no alternative options for purchasing warranty coverage other than directly from Defendant FCA.

127.    Any efforts to impose limits on warranties are substantively unconscionable. FCA knew that the Class Vehicles were defective and that the Class Vehicles could ignite when used as intended. FCA failed to disclose these defects to Plaintiffs and the other Class Members, and FCA actively concealed these defects as well. Thus, FCA's enforcement of terms that limit any warranty are substantively unconscionable, including durational limitations on the warranties and would shock the conscience.

128.    Plaintiffs are in privity with FCA given the nature of their relationship. To the extent privity is deemed to be not established, Plaintiffs are intended third-party beneficiaries of contracts between FCA and its dealers, and specifically, of FCA's implied warranties because the dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles for the intended benefit of consumers, like Plaintiffs. Finally, privity is also not required because the Class Vehicles are dangerous instrumentalities due to the defect.

129.    Pursuant to 15 U.S.C. § 2310(e), Plaintiffs are entitled to bring this class action and are not required to give FCA notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiffs pursuant to Rule 23 of the Federal Rules of Civil Procedure.

130.    Plaintiffs would suffer economic hardship if they returned their Class Vehicles but did not receive the return of all payments made by them. Because FCA will not acknowledge any revocation of acceptance and immediately return any payments made, Plaintiffs have not re-accepted their Class Vehicles by retaining them.

131.    The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit. Plaintiffs, individually and on behalf of all other class members, seek all

damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial.

132.    In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiffs are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably been incurred by Plaintiffs and the Nationwide Class members in connection with the commencement and prosecution of this action.

133.    Plaintiff and the Class Members are entitled to damages caused by Defendant's breach of the implied warranty of merchantability, including economic damages based upon either a return of Plaintiff's and Class Members' purchase price; and/or the difference between the price paid for the Class Vehicles as warranted and the actual value of the Class Vehicles as delivered, and consequential damages.

134.    In addition, Plaintiff and Class Members are entitled to reasonable attorneys' fees and costs as determined by the Court.

## SECOND CAUSE OF ACTION—Breach of Implied Warranty

### *(Alleged by all Plaintiffs on behalf of themselves and the Statewide Class and Subclass Members against Defendant FCA)*

135.    Plaintiffs incorporate and re-allege all preceding paragraphs as if fully set forth herein.

136.    FCA is a "merchant" within the meaning of Utah Code § 70A-2-104 and seller within the meaning of Utah Code § 70A-2-103.

137.    The Class Vehicles are "goods" under Utah Code § 70A-2-103. Under Utah Code § 70A-2-314, an implied warranty of merchantability applied to Class Vehicles.

138.    The Class Vehicles were not merchantable when sold or leased due to the defect that existed at the time of the sale or lease, which creates an unreasonable likelihood of underhood fires, death, serious bodily harm, and/or property damage. The defect caused the Class Vehicles at all times to be unmerchantable and unfit for their ordinary use of driving.

139.    Defendant breached the implied warranty of merchantability by selling the Class Vehicles with the defect.

140.    Defendant was put on adequate notice of its breach of warranty within a reasonable time by the NHTSA investigations, customer complaints, and by this and other legal proceedings brought against Defendant based on the alleged defect.

141.    Alternatively, Plaintiffs and Subclass Members were excused from providing FCA with notice and an opportunity to cure the breach of warranty because it would have been futile. FCA did not have a repair available when it announced the recall for the defect, and it still has not identified the root cause of the defect or provided an effective recall remedy to address the actual cause of the defect. As a result, Plaintiffs and Subclass Members had no reason to believe that FCA would have repaired the defect if they presented their Class Vehicles to FCA for repair.

142.    After receiving notice, FCA has failed to remedy the defect.

143.    Plaintiffs, Class Members and Subclass Members are entitled to damages in an amount to be determined at trial, and Plaintiffs seek all relief to which they are entitled.

### THIRD CAUSE OF ACTION—Breach of the Utah Consumer Sales Practices Act

*(Alleged by all Plaintiffs on behalf of themselves and the Statewide Class and Subclass Members against all Defendants)*

144.    Plaintiffs incorporate and re-allege all preceding paragraphs as if fully set forth herein.

145.    Under the Utah Consumer Sales Practices Act (UCSPA), a supplier may not commit a deceptive act or practice in connection with a consumer transaction. A supplier may also not commit an unconscionable act in connection with a consumer transaction. *See, e.g.*, Utah Code §§ 13-11-4(2), 13-11-5, and Rules R152-11-3(B)(5), R152-11-5(A)(4), R152-11-5(A)(8), R152-11-5(A)(10), R152-11-5(B)(1), R152-11-5(B)(7), R152-11-8(C), and R152-11-10(B) of the Utah Administrative Code.

146.    FCA violated the UCSPA when it knowingly, willingly, recklessly, or negligently violated the Utah Consumer Sales Practices Act by:

a)  Misrepresenting that the Class Vehicles are safe when these statements were false;

b)  Misrepresenting that the Class Vehicles contain a heating and cooling circuit that keeps the HV Battery operating at the optimal temperature when not true;

c) Misrepresenting that the Class Vehicles involve a warranty, particular warranty terms, or other rights or remedies when not true;

d) Failing to honor a warranty or a particular warranty term;

e) Failing to notify Plaintiffs, Class Members, or Subclass Members of the defect after learning of such defect;

f) Intentionally aligning recalls with manufacturing schedules to harm as many consumers as possible while minimizing their own harm;

g) Misrepresenting that the Class Vehicles contain a characteristic, use or benefit in regards to eco-friendly or a particular gas mileage efficiency when not true;

h) Misrepresenting, concealing, suppressing, or omitting material facts and information with the intent that others rely upon such concealment, suppression, misrepresentation, or omission in purchasing the Class Vehicles.

147.    FCA's repeated violations of the UCSPA were unconscionable.

148.    Doug Smith Autoplex, Inc. violated the UCSPA by misrepresenting to Plaintiffs and other class members that the vehicles are safe, reliable, and retain their value when not true. Doug Smith Autoplex knowingly and intentionally made the foregoing misrepresentations. In the alternative, it did so negligently.

149.    Defendants' violations of the UCSPA have caused Plaintiffs, Class and Subclass Members to incur damages, including the greater of statutory damages of $2,000 or actual damages, as well as attorney's fees and costs.

150.    Due to Defendants' intentional and reckless conduct, punitive damages should be entered against Defendants to prevent them and others from committing similar conduct in the future.

151.    Plaintiffs, Class and Subclass Members are entitled to a declaratory judgment that Defendants' actions are deceptive and considered unconscionable under the UCSPA.

152.    Defendants should be permanently enjoined from committing the same conduct in the future.

## FOURTH CAUSE OF ACTION—Breach of Express Warranty

*(Alleged by all Plaintiffs on behalf of themselves and the Statewide Class and Subclass Members against Defendant FCA)*

153.    Plaintiffs incorporate and re-allege all preceding paragraphs as if fully set forth herein.

154.    FCA is a "merchant" within the meaning of Utah Code § 70A-2-104 and seller within the meaning of Utah Code § 70A-2-103.

155.    The Class Vehicles are "goods" under Utah Code § 70A-2-103. Under Utah Code § 70A-2-313, FCA created an express warranty through its warrant booklet and materials guaranteeing the continued function and use of the HV Battery.

156.    Under the express warranty, FCA promised to repair and/or replace covered defective components, at no cost to owners and lessees of the Class Vehicles.

157.     Plaintiffs, Class and Subclass Members provided FCA with sufficient opportunities to repair or replace the Class Vehicles. Plaintiffs, Class and Subclass Members reasonably met all obligations and pre-conditions as provided in the express warranty. Plaintiffs, Class and Subclass Members provided FCA with notice of its breaches of warranty within a reasonable time after discovering such breaches.

158.     FCA breached these express warranties by failing to provide an effective and adequate remedy to the recall notices, and FCA only offered ineffective software updates to help identify defective hardware components instead of electing to replace the defective components.

159.     Plaintiffs could not have reasonably discovered the defects or non-conformities in the Class Vehicles prior to purchasing the vehicles.

160.     As alleged above, FCA knew or should have known of the defect.

161.     Any efforts to limit the express warranties in a manner that would exclude coverage of the Class Vehicles is unconscionable, and any such effort to disclaim, or otherwise limit liability for the Class Vehicles is null and void.

162.     Any efforts to impose limits on the express warranties are procedurally unconscionable due to unequal bargaining power between FCA and Plaintiffs and Class and Subclass Members. Plaintiff and Class and Subclass Members had no alternative options for purchasing warranty coverage other than directly from FCA.

163.    Any efforts to impose limits on the express warranties are substantively unconscionable. FCA knew that the Class Vehicles were defective and that the Class Vehicles could ignite when used as intended. FCA failed to disclose these defects to Plaintiffs and the other Class Members, and FCA actively concealed these defects as well. Thus, FCA's enforcement of terms that limit any warranty are substantively unconscionable, including durational limitations on the warranties and would shock the conscience.

164.    Plaintiffs are in privity with FCA given the nature of their relationship. To the extent privity is deemed to be not established, Plaintiffs are intended third-party beneficiaries of contracts between FCA and its dealers, and specifically, of FCA's express warranties because the dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles for the intended benefit of consumers, like Plaintiffs. Finally, privity is also not required because the Class Vehicles are dangerous instrumentalities due to the defect.

## FIFTH CAUSE OF ACTION—UNJUST ENRICHMENT

### (Alleged by all Plaintiffs on behalf of themselves and the Statewide Class and Subclass Members against Defendant FCA)

165.    Plaintiffs incorporate and re-allege all preceding paragraphs as if fully set forth herein.

166.    FCA benefitted at the expense of Plaintiffs, Class and Subclass Members by selling, leasing, and distributing the Class Vehicles as safe and charge more than the vehicles were worth, which Plaintiffs, Class and Subclass Members paid.

167.    Plaintiffs, Class, and Subclass Members also incurred additional costs they had not contemplated but were foreseeable by FCA as a result of the defect, and these costs should have been incurred by FCA.

168.    Plaintiffs, Class and Subclass Members were unaware of the defect when they purchased or leased their vehicles.

169.    FCA retaining the benefits of the costs incurred by Plaintiffs, Class and Subclass members is an inequitable benefit of their unjust conduct.

170.    Consequently, Plaintiffs, Class and Subclass Members are entitled to damages in an amount to be determined at trial based on the degree that FCA was unjustly enriched.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs, individually and on behalf of Members of the Statewide Class and Subclass, respectfully request that the Court enter judgment in favor against Defendants as follows:

1. Certification of the proposed Statewide Class and Subclass, with Plaintiffs as class representatives;

2. Appointment of Plaintiff's Counsel as Class Counsel;

3.  Special damages;

4.  Consequential damages;

5.  General damages;

6.  Prejudgment interest;

7.  Punitive damages'

8.  Injunctive and declaratory relief;

9.  Plaintiffs' attorney's fees and costs; and

10.  Any other relief the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs, Class, and Subclass Members request a jury trial of this matter.

DATED this 21[th] day of January, 2026.

HEAD LAW, PLLC

*/s/ David S. Head*

_____

David S. Head
Attorney for Plaintiffs

JANOVE PLLC

*/s/ Raphael Janove*

_____

Raphael Janove
Attorney for Plaintiffs